**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| DeAnn J. Drottz, | ) | No. CV 11-1596-PHX-JAT |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Park Electrochemical Corporation; Park Advanced Product Development Corporation, | ) | |
| Defendants. | ) | |

Pending before the Court is Defendants Park Electrochemical Corporation and Park Advanced Product Development Corporation's Motion for Summary Judgment. (Doc. 49). The Court now rules on the motion.

## I.    BACKGROUND

For purposes of the Court's resolution of the pending summary judgment motion, the Court considers the relevant facts and background, viewed in Plaintiff's favor, to be as follows.

Plaintiff, DeAnn Drottz, a Caucasian female, started working for Defendant Park Advanced Product Development Corporation ("Defendant") as a laboratory supervisor on September 24, 2007.  (Defendant's Statement of Facts ("DSOF"), Doc. 50 ¶ 6; Plaintiff's Statement of Facts ("PSOF"), Doc. 52 ¶¶ 6, 55 (admitting in part DSOF ¶ 6)).  Plaintiff is a

well-qualified employee and received satisfactory performance reviews from her former supervisor, Doug Leys ("Leys").  (Deposition of William Douglas Leys, March 20, 2013, Doc. 53, Ex. 1 at 8:13–20).  As lab supervisor (and later lab manager), Plaintiff's responsibilities included, among other things, equipment calibrations and maintaining and troubleshooting lab equipment.  (DSOF ¶ 6; PSOF ¶ 6 (admitting DSOF ¶ 6; Job Description Prepared by DeAnn Drottz, Dec. 4, 2010 ("Job Descrip."), Doc. 50, Ex. 3).

In May 2010, Leys ceased supervising Plaintiff and Ke Wang ("Wang"), a Chinese male, became Plaintiff's new supervisor.  (PSOF ¶ 52).  Under Wang's supervision, Plaintiff alleges that Wang "treated her in a way that suggested that he expected her to conform to expectations that stereotypical Chinese males have toward women.  He expected her to submit to slights, insults, criticisms and verbal abuse without complaining or challenging his authority."  (PSOF ¶ 51).  Plaintiff contends that Wang yelled at her and was intimidating, and that "Wang's treatment of her was different from and less favorable than the way he treated male employees."  (PSOF ¶¶ 53–54).

Plaintiff further claims that Wang's behavior towards her constituted race and sex-based discrimination and a hostile work environment.  To support her claims, Plaintiff articulates six incidents that she claims evidence Wang's discriminatory conduct ("Incidents One through Six"):

(1) In July 2010,[1] Plaintiff, in the course of performing her duties as the Lab Supervisor, asked her subordinate—Lily Hao ("Hao"), a Chinese female—about some notations on a lab report.  (Deposition of DeAnn Drottz, February 21, 2013 ("Drottz Dep."), Doc. 50, Ex. 2 at 120:1–122:22).  After determining that neither she nor Hao understood the notations, Plaintiff asked Hao to "check on [the notations]."  (*Id.*).  Hao then went to Wang's office, without Plaintiff, and spoke with Wang in Chinese (both Hao and Wang are native Chinese speakers and Plaintiff does not understand Chinese).  (*Id.*).  Wang then called

---

[1] Although Plaintiff's deposition (Doc. 50, Ex. 2; Docs. 54–56; Doc. 59-1, Ex. 1) and Controverting Statement of Facts (PSOF, Doc. 52) do not mention the date of Incident One, Plaintiff's Third Amended Complaint claims it occurred in July 2010 (Doc. 26 ¶ 14).

1  Plaintiff on the phone, yelled at her, and verbally reprimanded that "it's your job to know

2  what that notation is." (*Id.*).

3  (2) On an occasion when Wang was having either a golf or a business-related[2]

4  conversation with two male co-workers, Plaintiff approached and Wang remarked "Oh,

5  [Plaintiff] just came in.  I totally lost my train of thought."  (Drotz Dep., Doc. 54 at

6  113:8–116:7; *see* DSOF ¶ 15; PSOF ¶ 15 (admitting DSOF ¶ 15)).  Plaintiff claims that she

7  felt "insulted" by Wang's expression because "[Wang] just kind of looked off into the

8  distance like he was dazed or something.  Like somehow I was distracting him." (*Id.* at

9  114:2–5).

10  (3) In the summer of 2010 (Doc. 26 ¶ 12), when Wang was speaking with Plaintiff

11  about the differences between maternity leave in the U.S. and China, Wang asked Plaintiff

12  if she had any children. (DSOF ¶ 16; PSOF ¶ 16 (admitting DSOF ¶ 16).  Plaintiff responded

13  in the negative, and Wang asked, "Oh, not yet?" (Drotz Dep., Doc. 54 at 116:18–119:22).

14  Plaintiff claims that she felt insulted by the question despite admitting that Wang uttered no

15  other related statements or questions. (*Id.* at 118:20–23).  Specifically, Plaintiff assumed that

16  Wang's question was predicated on an "insulting" assumption that Plaintiff (a female) would

17  want to have children, and, therefore, the question evidenced Wang's "expectation that

18  [Plaintiff] was going to take maternity leave at some time." (*Id.*).

19  (4) In the summer of 2010 (Doc. 26 ¶ 13), Wang, Plaintiff, and others at a lower level

20  of authority within the lab than Plaintiff attended lab group meetings and discussed their

21  current projects. (Drotz Dep., Doc. 54 at 125:5–130:3).  During one of these meetings,

22  Plaintiff admitted to struggling for weeks to set-up a CNC machine that Wang had repeatedly

23  asked her to set-up. (*Id.* at 125:9–126:13).  In response, Wang loudly (but without yelling)

24  and repeatedly "voic[ed] his dissatisfaction that the machine was not set up." (*Id.*).  Plaintiff

25

---

26  [2] In her deposition, Plaintiff characterized the conversation as business related, but

27  also stated that she observed Wang make a golf-swing gesture.  (Drotz Dep., Doc. 54 at 113:8–116:7).  Additionally, Plaintiff has admitted (PSOF ¶ 15) Defendant's characterization

28  of the conversation as "discussing golf" (DSOF ¶ 15).

1    claims that Wang "wasn't singling [other group members] out of the group to criticize them,"

2    and Wang "never criticized the men the way [Wang] criticized [Plaintiff]." (*Id.* at 127:3–13;

3    128:25–129:8).

4              (5) On January 31, 2011,[3] Wang called Plaintiff into his office for a closed-door

5    meeting to discuss why Plaintiff had not yet replaced a pump necessary for the operation of

6    the lab's TMA machine. (Drottz Dep., Doc. 59-1 at 130:4–13). During the meeting, Plaintiff

7    told Wang that she had emailed him a requisition for the pump and was awaiting his

8    approval. (*Id.* at 2–7). Wang became upset, yelled at Plaintiff that she was a "liar," and

9    Wang "said that he knew people at Park who could hurt [Plaintiff] and hurt [Plaintiff's]

10   career." (*Id.* at 131:7–10). In her deposition, Plaintiff claims that she had, in fact, emailed

11   a requisition to Wang sometime in October 2010. (*Id.* at 139:22–24). Further, Plaintiff

12   admits that during the more than three months between her claimed email and the incident,

13   Plaintiff took no action and made no additional communication with Wang regarding the

14   pump requisition despite the pump being important for the function of the TMA machine.

15   (*Id.* at 136:25–8). Nonetheless, Plaintiff claims that she had "never seen [Wang] treat

16   anybody else like that." (*Id.* at 138:8–17).

17             (6) On February 17, 2011, Wang called Plaintiff into his office to question Plaintiff

18   about her failure to calibrate and affix calibration stickers to various lab equipment despite

19   having been requested to do so two weeks ago. (Drottz Dep., Doc. 56 at 194:16–200:23; *see*

20   DSOF ¶¶ 25–28; PSOF ¶¶ 25–28 (admitting DSOF ¶¶ 25–28). During the meeting, Plaintiff

21   was unable to answer Wang's questions regarding what a notation on the calibration report

22   meant. (*Id.* at 196:8–197:14). Wang responded by "raising his voice," showing Plaintiff a

23   copy of her job description, and reminding Plaintiff that, as lab manager, she was solely

24   responsible for calibrating the lab's equipment. (*Id.*). Plaintiff claims that Wang's tone and

25   manner of presentation indicated that Wang wanted to "pick a fight" with Plaintiff, and

26

27             [3] Plaintiff did not recall the exact date during her deposition (Drottz Dep., Doc. 54 at

28   137:15–20), but Plaintiff's Third Amended Complaint specifies the date (Doc. 26 ¶ 19).

1    Plaintiff has "never seen [Wang] address a male that way." (*Id.* at 199:18–200:13).

2           Notwithstanding the occurrence of Incidents One through Four, in October 2010,

3    Wang presented Plaintiff with a 3.1% increase in pay (an amount consistent with previous

4    raises). (Drottz Dep., Doc. 55 at 158:24–159:15). Additionally, at one point, Wang was

5    dissatisfied with the job performance of a male employee and gave supervisory authority

6    over that male employee's lab to Plaintiff because Wang believed Plaintiff would better

7    report on the lab's status than the male employee had been doing. (*Id.* at 145:9–146:8).

8           On February 1, 2011, Plaintiff met with Sue Macaluso ("Macaluso") (Defendant's

9    Vice President of Engineering and Wang's superior) to discuss Plaintiff's concern that Wang

10   was behaving in an abusive manner towards Plaintiff. (PSOF ¶ 59). Although Plaintiff

11   initially raised the question of a sexual basis for Wang's conduct, Macaluso "concluded by

12   the end of her conversation with Plaintiff that Wang's behavior towards Plaintiff was not on

13   account of her sex." (*Id.*).

14          On February 17, 2011, a final incident ("Incident Seven") between Plaintiff and Wang

15   occurred. Immediately after Incident Six (Wang's verbal criticism of Plaintiff's job

16   performance) Plaintiff excused herself from Wang's office, returned to her own office, and

17   initiated a telephone conversation with Macaluso. (DSOF ¶¶ 28–29; PSOF ¶¶ 28–29

18   (admitting DSOF ¶¶ 28–29)). A few minutes later, Wang approached Plaintiff's open-doored

19   office and Plaintiff, seeing Wang approaching, attempted to shut the door in Wang's face.

20   (Drottz Dep., Doc. 56 at 213:8–214:5; DSOF ¶ 29; PSOF ¶ 29 (admitting DSOF ¶ 29)).

21   Wang then placed his foot on the door, prevented it from closing on him, and opened the

22   door—all without touching Plaintiff in anyway. (DSOF ¶ 30; PSOF ¶ 30 (admitting DSOF

23   ¶ 30)). Wang entered Plaintiff's office, "demanded to know who Plaintiff was speaking

24   with," asked that Plaintiff put the call on speakerphone, sat down without blocking the door,

25   and left a few minutes later. (PSOF ¶ 61; Drottz Dep., Doc. 50, Ex. 2 at 215:23–217:15).

26   At no time did Wang touch or threaten to touch Plaintiff, approach her with a clenched fist,

27   tell her he was going to hit her, or lunge towards her. (DSOF ¶¶ 33, 35; PSOF ¶¶ 33, 35

28   (admitting DSOF ¶¶ 33, 35)). Additionally, while Wang was in her office, Plaintiff

1    continued her conversation with Macaluso, did not mention a fear of being hit by Wang, and

2    did not attempt to leave her office.   (Drottz Dep., Doc. 50, Ex. 2 at 215:23–217:15).

3    Nonetheless, after Incident Seven, Plaintiff filed a formal complaint with the on-site Human

4    Resources representative claiming that she feared Wang would hit her.  (PSOF at ¶ 62).

5         In her February 18, 2011 formal complaint (Doc. 50, Ex. 11), Plaintiff described her

6    version of Incident Seven, expressed a fear of physical violence from Wang, and requested

7    "that there be a witness present when [Wang] wants to have a conversation with me and that

8    he not be allowed contact with me accept [sic] in the presence of other employees."  (*Id.* at

9    2).  Without complaining of, or even mentioning, race or sex-based discrimination, Plaintiff

10   also briefly described five other grievances with Wang.  (*Id.* at 2–3).

11        Macaluso investigated Plaintiff's complaint, concluded that Plaintiff's racial and

12   sexual harassment claims were without merit, and determined that Plaintiff's fear of physical

13   violence perpetrated by Wang was unreasonable and without merit.  (DSOF ¶¶ 41–45; PSOF

14   ¶¶ 41–45 (denying the "reasonableness" of Macaluso's conclusions, but admitting the facts

15   in DSOF ¶¶ 41–45)).  On February 25, 2011, Macaluso and Greg Westphal (Vice-President

16   of Research and Development) presented Plaintiff with written discipline in the form of a

17   counseling memorandum that outlined Plaintiff's numerous performance deficiencies.

18   (DSOF ¶ 46; PSOF ¶¶ 46, 68 (largely admitting ¶ 46)).  Plaintiff was requested to create a

19   plan of action to improve her job performance and commit to improving her working

20   relationship with Wang.  (*Id.*).  In response, Plaintiff "refused to work with Wang (her direct

21   supervisor) and insisted that a witness be present whenever Wang needed to speak with her."

22   (*Id.*; PSOF ¶ 69).  Wang, on the other hand, committed to taking steps to improve his

23   working relationship with Plaintiff.  (DSOF ¶ 47; PSOF ¶ 47 (admitting DSOF ¶ 47)).  In

24   light of this, Macaluso concluded that the only reasonable option was to terminate Plaintiff's

25   employment.  (DSOF ¶ 49; PSOF ¶¶ 49, 69 (admitting DSOF ¶ 49)).  On February 28, 2011,

26   Plaintiff's employment with Defendant was terminated.  (*Id.*).

27        Plaintiff then filed a claim with the Equal Employment Opportunity Commission and

28   received a right-to-sue notice on May 19, 2011.  (Doc. 20-1 at 5).  Plaintiff's Third Amended

1   Complaint alleges five counts: (1) race and sex discrimination; (2) hostile work environment;
2   (3) retaliation; (4) race discrimination and retaliation under 42 U.S.C. § 1981; and (5)
3   wrongful discharge in violation of Arizona Revised Statutes ("A.R.S.") § 23-1501(3)(C)(ii).
4   (Doc. 26 ¶¶ 37–60).

5

6   **II.   LEGAL STANDARD FOR SUMMARY JUDGMENT**

7           Summary judgment is appropriate when "the movant shows that there is no genuine
8   issue as to any material fact and that the moving party is entitled to summary judgment as a
9   matter of law." Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be or is genuinely
10  disputed must support that assertion by "citing to particular parts of materials in the record,"
11  including depositions, affidavits, interrogatory answers or other materials, or by "showing
12  that materials cited do not establish the absence or presence of a genuine dispute, or that an
13  adverse party cannot produce admissible evidence to support the fact." *Id.* at 56(c)(1).  Thus,
14  summary judgment is mandated "against a party who fails to make a showing sufficient to
15  establish the existence of an element essential to that party's case, and on which that party
16  will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
17          Initially, the movant bears the burden of pointing out to the Court the basis for the
18  motion and the elements of the causes of action upon which the non-movant will be unable
19  to establish a genuine issue of material fact. *Id.* at 323.  The burden then shifts to the non-
20  movant to establish the existence of material fact. *Id.*  The non-movant "must do more than
21  simply show that there is some metaphysical doubt as to the material facts" by "com[ing]
22  forward with 'specific facts showing that there is a *genuine* issue for trial.'" *Matsushita Elec.*
23  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)
24  (1963) (amended 2010)).  A dispute about a fact is "genuine" if the evidence is such that a
25  reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,*
26  *Inc.*, 477 U.S. 242, 248 (1986).  The non-movant's bare assertions, standing alone, are
27  insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.*
28  at 247–48. In the summary judgment context, however, the Court construes all disputed facts

1  in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072,
2  1075 (9th Cir. 2004).

3       Moreover, the Ninth Circuit Court of Appeals "has set a high standard for the granting
4  of summary judgment in employment discrimination cases." *Schnidrig v. Columbia Mach.*,
5  *Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). As the Ninth Circuit has explained, "[w]e require
6  very little evidence to survive summary judgment in a discrimination case, because the
7  ultimate question is one that can only be resolved through a 'searching inquiry'—one that
8  is most appropriately conducted by the factfinder, upon a full record." *Lam v. Univ. of*
9  *Hawai'i*, 40 F.3d 1551, 1564 (9th Cir. 1994) (internal quotations omitted).

10

11  **III.   ANALYSIS**

12       As stated above, Plaintiff's Third Amended Complaint alleges five counts: (1) race
13  and sex discrimination; (2) hostile work environment; (3) retaliation; (4) race discrimination
14  and retaliation under 42 U.S.C. § 1981; and (5) wrongful discharge in violation of A.R.S. §
15  23-1501(3)(C)(ii). (Doc. 26 ¶¶ 37–60). Defendant moves for summary judgment on all five
16  counts. (Doc. 49). The Court will consider each count in turn.

17       **A.    Race and Sex[4] Discrimination**

18       Plaintiff's first cause of action alleges that Defendant has violated Title VII, 42 U.S.C.
19  § 2000e-2(a), by treating Plaintiff inconsistently from Defendant's Caucasian male and
20  Chinese female employees. (Doc. 26 ¶ 38). This provision of Title VII makes "disparate
21  treatment" based on sex or race a violation of federal law. *Villiarimo v. Aloha Island Air,*
22  *Inc.*, 281 F.3d 1054, 1061–62 (9th Cir. 2002) (citation omitted); *see Johnson v. Teltara, LLC*,
23  No. CV 08-1894-PHX-JAT, 2010 WL 2873492, at *4 (D. Ariz. July 20, 2010).

24  _____

25       [4] In their motions and exhibits, both parties use the term "sex" and "gender"
26  interchangeably to refer to discrimination or harassment based on a male/female distinction.
    Plaintiff's claims do not appear to be based in any way upon allegations of unwanted sexual
27  advances or overtures, or language or conduct of a prurient nature. For the sake of clarity
    and consistency within this Order, the Court will use the word "sex" to refer solely to a
28  male/female distinction.

**1.    Legal Framework For Disparate Treatment Discrimination Claims**

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a).  To prevail on a Title VII claim, the plaintiff must prove that an adverse employment action was taken "because of" unlawful discrimination. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 857 (9th Cir. 2002).  Title VII disparate-treatment claims like Plaintiff's, "require the plaintiff to prove that the employer acted with conscious intent to discriminate." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805–06 (1973).  Specifically, the plaintiff must show that (1) she belongs to a protected class, (2) she performed according to her employer's legitimate expectations, (3) she was subjected to an adverse employment action, and (4) similarly situated individuals outside her protected class were treated more favorably. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (internal citations omitted).  The Ninth Circuit "has explained that under the McDonnell Douglas framework, 'the requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.' " *Id.* (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

Furthermore, Courts employ a burden-shifting analysis for Title VII claims:

> [T]he plaintiff must establish a prima facie case of discrimination.  If the plaintiff succeeds in doing so, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct.  If the defendant provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination.

*Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2004) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802–05).  At the summary judgment stage, the plaintiff does not have to prove that the employer's reason for firing her was pretext for discrimination, but the plaintiff must introduce evidence sufficient to raise a genuine issue of material fact as to whether the employer's reason was pretextual. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000).

**2.    Prima Facie Case**

Initially, the Court notes that Defendant's motion bisects the issues of race and sex

discrimination and argues against each separately. (Doc. 49 at 3–7). Plaintiff objects to this approach (Doc. 51 at 6), but offers no explanation as to why the cumulative effect of her two discrimination claims is greater than their sum such that Plaintiff would be prejudiced if the Court were to segregate its analysis by type of claim. Instead, Plaintiff's argument, in its entirety, is that: "the allegations that [Plaintiff] has made form the basis of her belief that Wang Ke held her to expectations that she would behave in a way that was deferential and submissive. He did not yell at the male employees or demean them in front of coworkers as he did to her." (*Id.* (citing PSOF ¶¶ 51, 54)). Although Plaintiff's deposition reveals that she believed Wang discriminated against her specifically because she was both Caucasian and female (Drottz Dep., Doc. 54 at 96:22–98:4), Plaintiff specifically testified that every allegedly discriminatory incident involving Wang, except for one, was discriminatory on the basis of Plaintiff's sex, *not* her race. (Drottz Dep., Doc. 59-1 at 112:20–141:14). Plaintiff further testified that the single alleged incident of racially motivated discrimination was *not* also on the basis of Plaintiff's sex. (*Id.* at 124:25–125:4). Accordingly, the Court will separately consider Plaintiff's race and sex discrimination claims.

### a.    Race Discrimination

Defendant argues that Plaintiff has failed to establish a prima facie case of race discrimination because Plaintiff has failed to establish that Wang acted with a racially motivated animus and because Plaintiff did not suffer an adverse employment action. (Doc. 49 at 3–4). Defendant is correct on both points.

First, Plaintiff has failed to establish racially motivated animus. Plaintiff's allegation of race discrimination stems solely from Incident One, described above, where Wang "yelled at" Plaintiff over the phone because Plaintiff did not know what a particular notation on a lab report meant. (Drottz Dep., Doc. 59-1, Ex. 1 at 119:23–125:4). When asked how this incident demonstrates racial animus, Plaintiff explained:

> A:  Well, I believe [Wang] and [Hao] had some kind of relationship or conversation going on. I think [Hao] went up to complain about my asking her about the -- the notation, and they had a conversation that I couldn't take part in because I can't speak Chinese. They didn't tell me what the conversation went -- how it went. Wang didn't ask me -- you know, he -- he didn't come

to me and say, "Hey, [Hao] had a question about this notation and she's -- you know, she had questions about it.  She was upset about it," whatever. [Wang] just -- he just started yelling at me.  And I couldn't defend myself because I couldn't take part in the conversation because they were speaking Chinese.

. . . .

Q: Okay.  Are you telling me that you suspect that Wang and [Hao] somehow discriminated against you on the basis of your Caucasian race because they are both Chinese?

A: Yes, sir.

(*Id.* at 123:1–124:1).  In Plaintiff's Response (Doc. 51), Plaintiff further explains the basis of her race discrimination claim: "Wang, a Chinese male, treated [Plaintiff] in a way that suggested that he expected her to conform to expectations that stereotypical Chinese males have toward women.  He expected her to submit to slights, insults, criticisms and verbal abuse without complaining or challenging his authority."  (Doc. 52 ¶ 51; *see* Doc. 51 at 6). In her deposition, however, Plaintiff articulates no additional facts informing the basis of her speculation that "[Wang] expected [Plaintiff] to act like a -- like a Chinese woman."  (Drottz Dep., Doc. 55 at 161:8–21, 165:3–15).

The Court finds that Plaintiff's scant evidence has failed to raise a genuine issue of material fact as to whether Wang subjected Plaintiff to discrimination based on her Caucasian race.  Speaking in Chinese to another Chinese speaker, outside of the presence of a non-Chinese speaker, simply does not suffice.  Moreover, to the extent that Plaintiff argues that the impetus for Wang's behavior was a "stereotypical[ly] Chinese male" belief that women should be subservient, Plaintiff's own racial stereotyping does not transmute Plaintiff's sex discrimination claim into a race discrimination claim.  Thus, the Court finds no racially discriminatory nexus between Wang's alleged conduct and Plaintiff's protected class. Wang's "yelling" may have been rude, but rudeness, alone, is not actionable.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("Title VII . . . does not set forth 'a general civility code for the American workplace.' " (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

Second, assuming Plaintiff had been able to establish a racially discriminatory nexus

between her treatment and Wang's conduct, Plaintiff has failed to establish that an adverse employment action occurred. "[A]n adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of . . . employment.' " *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000); *see also Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818–19 (9th Cir. 2002)). Plaintiff has provided no evidence suggesting that Wang's one-time, July 2010, verbal reprimand had any affect, let alone a material affect, on her job duties or compensation, or even was placed in her personnel file. Indeed, the verbal reprimand was not even mentioned in the February 25, 2011 written Counseling/Discipline Memo that precipitated Plaintiff's termination. (Doc. 50, Ex. 13). Because Plaintiff has not established (or even suggested) that Wang's verbal reprimand materially affected her employment, Wang's verbal reprimand, as a matter of law, is not an adverse employment action. *Nunez v. City of Los Angeles*, 147 F.3d 867, 874–75 (9th Cir. 1998) (stating that a supervisor's "scolding . . . and threatening to transfer or dismiss" an employee are not adverse employment actions); *see also Hellman v. Weisberg*, No. CV-06-1465-PHX-FJM, 2007 WL 4218973, at *6 (Title VII does not insulate an employee from criticism), *aff'd* 350 Fed.Appx. 776 (9th Cir. 2009); *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) ("badmouthing" an employee does not constitute an adverse employment action).

In sum, Plaintiff has failed to show a genuine issue of material fact that this isolated incident subjected Plaintiff to racially discriminatory conduct and adversely affected her employment. Lacking a prima facie case of race discrimination, the Court has no need to complete the remainder of the *McDonnell Douglas* burden-shifting analysis. Accordingly, the Court grants summary judgment to Defendant on Plaintiff's claim of race discrimination.

### b.    Sex Discrimination

Defendant argues that Plaintiff has failed to establish a prima facie case of sex discrimination because Plaintiff did not suffer an adverse employment action. (Doc. 49 at 3–4). Although the Court of Appeals has defined adverse employment actions "broadly," *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004); *Ray v.*

1   *Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000),  Defendant is nonetheless correct.

2   "[A]n adverse employment action is one that 'materially affect[s] the compensation,

3   terms, conditions, or privileges of . . . employment.'" *Davis*, 520 F.3d at 1089.  In her Third

4   Amended Complaint, Plaintiff attempts to plead an adverse employment action by claiming

5   that Wang's alleged sex discrimination caused Plaintiff to "suffer[] from periods of loss of

6   work, loss of pay, pay increases [sic],[5] and emotional distress."[6]  (Doc. 26 ¶ 40).  Plaintiff,

7   however, offers no evidence substantiating any of these alleged harms.

8   Construing Plaintiff's Response (Doc. 51) rather broadly, Plaintiff appears to argue

9   that Wang's manner of interacting with and verbal criticisms of Plaintiff, together, constitute

10  the adverse employment action[7] necessary for a prima facie sex discrimination claim.

11  Specifically, Plaintiff purports to demonstrate that Wang expected her to "behave in a way

12  that was deferential and submissive," and Wang "did not yell at the male employees or

13  demean them in front of coworkers as he did to her."  (*Id.* at 6 (citing PSOF ¶¶ 51, 54)).

14  Plaintiff supports her claims with her own deposition testimony concerning Incidents

15  Two through Six, as detailed above.  Plaintiff alleges that Wang discriminated against her

16  on the basis of her sex in each of these five incidents.  Specifically, Plaintiff claims that

17  Wang's "lost train of thought" comment in Incident Two evidences sex discrimination

18

19  _____

20  [5] Plaintiff does not appear to intend to demonstrate an adverse employment action

21  with evidence that she suffered a *decrease* in pay because Plaintiff's pleadings and evidence
    make no mention of it.  The Court notes, however, that under Wang's supervision, in October

22  2010, Plaintiff did, in fact, "suffer" a 3.1% *increase* in pay (an amount consistent with
    previous raises).  (Drottz Dep., Doc. 55 at 158:24–159:15).

23

24  [6] Plaintiff has neither pleaded nor argued that her termination was an adverse
    employment action motivated by Wang's sex discrimination.  (*See* Doc. 26 ¶¶ 37–41; Doc.

25  51).  Indeed, Plaintiff's employment was terminated by Macaluso (also a Caucasian female).

26  [7] Plaintiff may be conflating the "adverse employment action" element necessary for

27  a disparate treatment sex discrimination claim with the "conduct sufficiently severe or
    pervasive to alter the conditions of employment" element necessary for a hostile workplace

28  claim based on sexual (gender) harassment.

1    because she felt "insulted" by Wang's expression.[8] (Drottz Dep., Doc. 54 at 114:22–115:14).

2    Plaintiff claims that Wang's "not yet?" question in Incident Three evidences sex

3    discrimination because she felt insulted by Wang's question despite admitting that Wang

4    uttered no other related statements or questions. (*Id.* at 118:20–23). Plaintiff claims that the

5    verbal criticism she suffered in Incident Four evidences sex discrimination because Wang

6    "wasn't singling [other group members] out of the group to criticize them," and Wang "never

7    criticized the men the way [Wang] criticized [Plaintiff]." (*Id.* at 127:3–13; 128:25–129:8).

8    Plaintiff claims that the verbal criticism and threat to her career she suffered in Incident Five

9    evidences sex discrimination because she had "never seen [Wang] treat anybody else like

10   that." (*Id.* at 138:8–17). Lastly, Plaintiff claims that the verbal criticism she suffered in

11   Incident Six evidences sex discrimination because Wang's tone and manner of presentation

12   indicated that Wang wanted to "pick a fight" with Plaintiff, and because Plaintiff has "never

13   seen [Wang] address a male that way." (*Id.* at 199:18–200:13).

14         Even viewing the evidence in the light most favorable to Plaintiff and construing

15   "adverse employment action" broadly,[9] the Court finds that Plaintiff has failed to establish

16   that she suffered an adverse employment action. Incidents Two and Three, even if intended

17   to be insulting, amount to no more than isolated remarks that Plaintiff has not shown affected

18   the terms or conditions of her employment in any material way. *See Oncale*, 523 U.S. at 80

19   (noting Title VII does not create "a general civility code for the American workplace"); *see*

20   *also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (noting that "simple teasing,

21   offhand comments, and isolated incidents (unless extremely serious) will not amount to

22   discriminatory changes in the terms and conditions of employment") (internal quotations and

23

24         [8] "[Wang] just kind of looked off into the distance like he was dazed or something. Like somehow I was distracting him." (Drottz Dep., Doc. 54 at 114:2–5).

25

26         [9] The Supreme Court has held that the term "adverse employment action" "not only covers 'terms' and 'conditions' in the narrow sense, but 'evinces a congressional intent to

27   strike at the entire spectrum of disparate treatment . . . in employment.' " *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Meritor Savings Bank,*

28   *FSB v. Vinson*, 477 U.S. 57, 64 (1986)).

citation omitted).

Incidents Four and Six evidence only Wang's verbal criticism of Plaintiff for poor job performance, albeit Incident Four occurred in front of Plaintiff's subordinates. Nonetheless, mere verbal criticism of an employee, even in front of the employee's subordinates, does not constitute an adverse employment action. *See Nunez*, 147 F.3d at 874–75 (a supervisor's scolding is not an adverse employment action); *Brooks*, 229 F.3d at 929 ("bad mouthing" an employee does not constitute an adverse employment action); *Hellman* 2007 WL 4218973, at *6 (verbal criticisms of an employee are not adverse employment actions).

Incident Five evidences poor communication between Wang and Plaintiff, verbal criticism of Plaintiff's poor job performance, and an un-acted-upon verbal threat to Plaintiff's career. The verbal threat to Plaintiff's career is the most severe of Plaintiff's allegations. Plaintiff, however, neither makes an allegation nor proffers evidence suggesting that Wang's threat was ever acted upon or otherwise materially affected the terms or conditions of Plaintiff's employment. Therefore, Wang's threat does not constitute an adverse employment action. *See Nunez*, 147 F.3d at 874–75 (where un-acted-upon verbal threats to transfer or dismiss an employee are not adverse employment actions); *Hellman*, 2007 WL 4218973, at *6 (same).

In sum, Plaintiff has failed to create a genuine issue of material fact that any of these five incidents, Incidents Two through Six, subjected Plaintiff to sexually discriminatory conduct that resulted in an adverse employment action. Lacking a prima facie case of sex discrimination, the Court has no need to complete the remainder of the *McDonnell Douglas* burden-shifting analysis. Accordingly, the Court grants summary judgment to Defendant on Plaintiff's claim of sex discrimination.

### B.     Hostile Work Environment Based on Sexual and Racial Harassment

Plaintiff's second cause of action alleges that Defendant subjected her to a race and gender based hostile work environment. (Doc. 26 ¶¶ 42–45). Title VII's general prohibition against discrimination extends to harassment claims. *See, e.g.*, *Faragher*, 524 U.S. at 786; *Manatt v. Bank of America*, 339 F.3d 792, 798 (9th Cir. 2003); *Fuller v. City of Oakland*,

1  *Cal.*, 47 F.3d 1522, 1527 (9th Cir. 1995).

2  **1.    Legal Framework**

3      To prevail on a hostile workplace claim based on either race or sex, a plaintiff must

4  show: "(1) that he was subjected to verbal or physical conduct of a racial or sexual nature;

5  (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or

6  pervasive to alter the conditions of the plaintiff's employment and create an abusive work

7  environment." *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998).   The work

8  environment must be perceived as both subjectively and objectively abusive. *Fuller*, 47 F.3d

9  at 1527.   "Whether the workplace is objectively hostile must be determined from the

10  perspective of a reasonable person with the same fundamental characteristics." *Id.*   In

11  determining whether a work environment is sufficiently hostile or abusive to support a claim,

12  the Court should look at all the circumstances; including, the frequency of the discriminatory

13  conduct, the severity of the conduct, whether the conduct is physically threatening or

14  humiliating; and whether the conduct unreasonably interferes with employee's work

15  performance. *Faragher*, 524 U.S. at 787–88.

16      Even if an employee establishes a prima facie case of harassment by a supervisor,

17      when no "tangible employment action" has been taken, an employer may raise
    "an affirmative defense to liability or damages, subject to proof by a

18      preponderance of the evidence." *Burlington*, 524 U.S. at 765. The affirmative
    defense has two prongs: (1) "that the employer exercised reasonable care to

19      prevent and correct promptly any sexually harassing behavior"; and (2) "that
    the plaintiff unreasonably failed to take advantage of any preventive or

20      corrective opportunities provided by the employer or to avoid harm
    otherwise." *Id.*  Whether the employer has a stated antiharassment policy is

21      relevant to the first element of the defense. *Id.*  And an employee's failure to
    use a complaint procedure provided by the employer "will normally suffice to

22      satisfy the employer's burden under the second element of the defense." *Id.*

23  *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 877 (9th Cir. 2001).

24  **2.    Prima Facie Case**

25      Initially, the Court notes that in her Response, Plaintiff does not offer an argument

26  supporting her racial harassment claim and appears to have abandoned it.  (Doc. 51 at 6).

27  Defendant, in its Motion, accurately explains that in her deposition, Plaintiff complained of

28  racial animus in only a single incident (Wang and Hao's conversation in Chinese, discussed

1    above).  (Doc. 49 at 8).  As explained above, this single incident evidenced no racial animus

2    and, as such, cannot have been sufficiently severe or pervasive to give rise to a racially

3    hostile work environment.

4           With regard to Plaintiff's sexual harassment hostile work environment claim,

5    Defendant argues (Doc. 49 at 7–9) that Plaintiff has failed to establish two of the three

6    elements of a prima facie case; namely (1) that she was subjected to sex-based verbal or

7    physical conduct; and (3) that the conduct was sufficiently severe or pervasive to alter the

8    conditions of the plaintiff's employment and create an abusive work environment.

9           To establish the first element, Plaintiff must demonstrate

10       that she was in some manner targeted for harassment because of her gender
     and not merely that she was subjected to nonactionable offensive behavior by
11   co-workers.  *Dominguez-Curry v. Nevada Transportation Dep't*, 424 F.3d
     1027, 1034 (9th Cir. 2005) ("The plaintiff [alleging a hostile work
12   environment sexual harassment claim] also must prove that any harassment
     took place because of sex.") (Internal quotation marks omitted.)  This
13   distinction between mere harassment and discriminatory harassment exists
     because Title VII is not a general civility code for the workplace and does not
14   prohibit all employment-related verbal or physical harassment.  *Oncale v.
     Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *see also*, *Brooks
15   v. City of San Mateo*, 229 F.3d 917, 927 (9th Cir. 2000) ("[N]ot all workplace
     conduct that may be described as harassment affects a term, condition, or
16   privilege of employment within the meaning of Title VII.")

17   *Pappas v. J.S.B. Holdings, Inc.*, 392 F.Supp.2d 1095, 1102–03 (D. Ariz. 2005).

18          Plaintiff relies on the same five verbal incidents[10] that form the basis of her sex

19   discrimination claim to evidence her claim that Wang treated her in a sexually abusive

20   manner by "often sp[eaking] to her in angry tones, yell[ing] at her and demean[ing] her in

21   front of coworkers." (Doc. 51 at 6).  Even assuming that Incidents Two through Six occurred

22   exactly as Plaintiff has described in her deposition, Plaintiff overstates the significance of the

23   evidence she has submitted.

24          Incidents Two and Three were, at most, one-time stray remarks.  " 'Stray' remarks are

25

26       [10] In her Third Amended Complaint, Plaintiff generally alleges numerous instances
     of hostile or abusive conduct by Wang.  (Doc. 26).  In her deposition, however, Plaintiff
27   could only point to five incidents as instances where she believed her sex was a motivating
28   factor for Wang's behavior.

1    insufficient to establish discrimination." *Merrick v. Farmers Ins. Group*, 892 F.2d 1434,

2    1438 (9th Cir. 1990) (quotation omitted); *see also Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705

3    (9th Cir. 1993) (discriminatory remark "uttered in an ambivalent manner" and "not tied

4    directly" to employment decision was at best "weak circumstantial evidence of

5    discriminatory animus" and insufficient to defeat summary judgment).

6         Incidents Four, Five, and Six, all of which involved verbal criticisms of Plaintiff's

7    poor job performance, are similarly insufficient to defeat summary judgment.  Plaintiff has

8    not offered any specific epithets, derogatory language, profanity, or demeaning language of

9    any kind that would support her claim of sex harassment.  Instead, Plaintiff merely points to

10   non-specific descriptions of Wang's tone, raised voice, or yelling as evidence of sex

11   harassment.  Additionally, Plaintiff expects the Court to infer that because she had not

12   observed Wang speak to male employees in a similar fashion,[11] Wang's criticism of Plaintiff

13   must have been based on Plaintiff's sex.  Such an inference, however, would require the

14   Court to ignore at least eight salient admissions by Plaintiff:

15        (1) each of the three incidents of verbal criticism were precipitated by Plaintiff's

16   admission to Wang that she had failed to complete important job duties (Drottz Dep., Doc.

17   54 at 126:11–13, 136:25–137:8, 197:8–19);

18        (2) because equipment maintenance and calibration were solely within Plaintiff's job

19   responsibilities, it was entirely reasonable for Wang to question Plaintiff about why the CNC

20   and TMA machines had been inoperable for several months, and why Plaintiff had not

21   calibrated the lab equipment (DSOF ¶¶ 20–23, 28; PSOF ¶¶ 20–23, 28 (admitting DSOF ¶¶

22   20–23, 28); Job Descrip., Doc. 50, Ex. 3);

23        (2) Wang had justifiably higher expectations of Plaintiff than every other employee

24   _____

25        [11] In her deposition, Plaintiff generally alleges that Wang "never criticized the men
     the way he criticized me." (Drottz Dep., Doc. 54 at 129:7–8).  Plaintiff, however, could only

26   point to three specific males whom she claims were treated preferentially: Marty Choate,
     Greg Almen, and Joe Bauler.  (*Id.* at 143:1–147:3).  With regard to Joe Bauler (Plaintiff's

27   subordinate), Plaintiff claims that Wang privately communicated praise for Bauler's work

28   to Plaintiff without also acknowledging Plaintiff's contribution.  (*Id.* at 146:11–147:3).

(male or female) because Plaintiff was the sole lab manager/supervisor—the position under Wang with the highest rank and most responsibilities (Drottz Dep., Doc. 50, Ex. 2, at 129:9–19, 142:11–14, 147:6–148:9);

(3) two of the three verbal criticisms were in Wang's private office, and therefore did not "demean" Plaintiff in front of her coworkers;

(4) Plaintiff testified that she was not in a position to evaluate whether or not the male employees were adequately performing their jobs to Wang's expectations (*id.* at 143:18–144:13);

(5) Plaintiff had no knowledge of whether or not Wang also privately criticized male employees about their job performance (*see id.* at 143:15–17, 144:19–21);

(6) Wang, at one point, was dissatisfied with the job performance of a male employee and gave supervisory authority over that male employee's lab to Plaintiff because Wang believed Plaintiff was performing her job in a manner superior to the male employee's performance[12] (*id.* at 145:9–146:8);

(7) Wang did not subject any other female employee in the lab to any sex-based criticism or harassing conduct (*id.* at 129:6–8); and

(8) On February 1, Plaintiff met with Macaluso (Wang's superior) to discuss Wang's behavior. Although Plaintiff initially raised the question of a sex-based reason for Wang's conduct, by the end of the conversation, Plaintiff had withdrawn the concern.[13] (Deposition of Susan Macaluso, March 28, 2013 ("Macaluso Dep."), Doc. 57 at 6:20–7:21). Although not directly admitted by Plaintiff, Plaintiff has offered no evidence contradicting Macaluso's deposition testimony.

---

[12] The Court notes that the male employee in question, Greg Almen, is one of the three male employees that Plaintiff specifically alleges Wang treated more preferentially that her.

[13] "[Plaintiff] had expressed a concern that she may have been being treated differently [by Wang] because she was a woman, but as we progressed through the conversation, she essentially came to the conclusion that was not the case, as did I, and she withdrew that concern by the close of the conversation." (Macaluso Dep., Doc. 57 at 7:16–21).

In effect, Plaintiff is asking the Court to ignore all evidence of context or contradiction and narrowly focus its attention on only two facts: (1) Wang criticized Plaintiff's (a woman's) job performance, and (2) Plaintiff did not observe Wang criticizing the job performance of three other male colleagues. While the Court is mindful to construe all disputed facts in the light most favorable to Plaintiff, *Ellison*, 357 F.3d 1075, the Court cannot ignore undisputed facts that provide context for or contradict Plaintiff's claims. A supervisor's occasional verbal criticism, even if delivered untactfully,[14] does not transmute into sex-based harassment merely because the subject of the criticism is of a different sex than the majority of her non-criticized coworkers.

Nonetheless, Plaintiff cites (Doc. 51 at 6–7) to the Ninth Circuit's decision in *E.E.O.C. v. National Educ. Ass'n, Alaska*, for the proposition that she need not demonstrate the elements above because "[t]he ultimate question . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which the other sex are not exposed." 422 F.3d 840, 844 (2005) (internal quotations and citations omitted). Plaintiff, however, seriously misstates the actual holding of *National Educ. Ass'n*:

> We acknowledge that our invocation of the "reasonable woman" standard, which renders sex-specific differences in the subjective effects of objectively identical behavior sufficient to ground a claim of discrimination, was rooted in the context of explicitly sex- or gender-specific conduct or speech. We now hold that evidence of differences in subjective effects (along with, of course, evidence of differences in objective quality and quantity) is relevant to determining whether or not men and women were treated differently, even where the conduct is not facially sex- or gender-specific.

*Id.* at 845–46. Thus, *National Educ. Ass'n* merely instructs the Court to consider a plaintiff's evidence that the allegedly sex-based harassing conduct had a different subjective effect on plaintiff's sex than on opposite-sexed co-workers. *Id.* Moreover, *National Educ. Ass'n* explicitly states that the "different subjective effects" analysis supplements, rather than replaces, the more traditional objectively qualitative and quantitative analysis of differences in conduct. *Id.* Plaintiff's evidence that Wang treated women, as a class, differently than

---

[14] Title VII does not create "a general civility code for the American workplace." *Oncale*, 523 U.S. at 80.

their male co-workers has been exhaustively considered above and found lacking.[15] Therefore, when reviewing all of Plaintiff's evidence and admissions, both individually and cumulatively,[16] the Court cannot reasonably conclude that Plaintiff was subjected to verbal conduct of a sex-based harassing nature (the first element of a prima facie case).

Plaintiff also fails to establish the third element of a prima facie case. Plaintiff's evidence is insufficient to establish that Wang's conduct was severe or pervasive enough to alter the conditions of Plaintiff's employment. The two stray remarks and three instances of verbal criticism, spread over several months, do not constitute pervasive conduct. Additionally, the job-specific criticism, uttered without profanity or otherwise demeaning language, does not constitute severe conduct merely because Wang unspecifically used his tone and volume to express his displeasure at Plaintiff's poor job performance.

In sum, Plaintiff has failed to show a genuine issue of material fact that Wang's conduct subjected plaintiff to a hostile work environment based on sexual harassment. Lacking a prima facie case, the Court need not analyze the merits of Defendant's affirmative defense (Doc. 49 at 9–11; Doc. 59 at 6–8) that it took prompt, effective remedial action and Plaintiff unreasonably failed to report the alleged sexual harassment. Accordingly, the Court grants summary judgment to Defendant on Plaintiff's claim of a hostile work environment based on sex-based and racial harassment.

## C.   Retaliation for Complaints of Sex and Race Discrimination

Plaintiff's third cause of action alleges that, in violation of Title VII, Defendant

---

[15] Plaintiff incorrectly argues (Doc. 51 at 5–6) that Wang's alleged conduct is analogous to the conduct found to be sexually harassing in *National Educ. Ass'n.* The case is distinguishable because Plaintiff has accused Wang of far less than repeated and severe instances of "screaming, foul language, invading employee's personal space (including one instance of grabbing a female employee from behind), and threatening physical gestures, all apparently following little or no provocation." *National Educ. Ass'n*, 422 F.3d at 844.

[16] The Ninth Circuit has held that discriminatory acts that are "not always of a nature that could be identified individually as significant events" may nonetheless be "significant, both as a legal and as a practical matter" in their "cumulative effect." *See Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir. 1998).

terminated her employment in retaliation for Plaintiff's complaint of sex and race discrimination. (Doc. 26 ¶¶ 46–50). Title VII prohibits employers from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

### 1.    Legal Framework

The *McDonnell Douglas* framework and allocation of proof that governs disparate treatment claims also governs retaliation claims. *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) (citing *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 784 (9th Cir. 1986). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation. *McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of retaliation, a plaintiff must show: (1) engagement in a protected activity, (2) an adverse employment action, and (3) a causal link between the two. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). If the plaintiff establishes a prima facie case of retaliation, the defendant has the burden of articulating a legitimate, non-retaliatory reason for its action. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005); *McDonnell Douglas*, 411 U.S. at 802. Once the defendant has presented a purpose for the action, the plaintiff bears the ultimate burden of providing evidence that the defendant's reason is "merely a pretext for a retaliatory motive." *Id.*; *McDonnell Douglas*, 411 U.S. at 804.

### 2.    Prima Facie Case

Plaintiff has offered sufficient evidence to survive summary judgment on the first two elements: reporting perceived sex-based and race-based discrimination is a protected activity; and termination of employment[17] is an adverse employment action.

---

[17] In Plaintiff's Response, Plaintiff for the first time argues that the February 25 disciplinary warning was also a retaliatory action. (Doc. 51 at 11). Plaintiff's Third Amended Complaint only alleged termination (Doc. 26 at ¶¶ 47–48) and, at deposition, Plaintiff's counsel agreed to "stipulate that the only retaliatory act that [Plaintiff] is claiming is termination" (Drottz Dep., Doc. 50, Ex. 2 at 265:16–22). Consequently, the Court will not consider whether the February 25 disciplinary warning was a retaliatory action. *See Trishan Air, Inc. v. Federal Ins. Co.*, 635 F.3d 422, 435 n.19 (9th Cir. 2011) (holding that a claim

1        With regard to the third element, until recently in the Ninth Circuit, the plaintiff in a

2   Title VII retaliation claim could establish the causal element of a retaliation claim by merely

3   showing that the protected activity was a motivating factor in the adverse employment action.

4   However, following the recent United States Supreme Court decision in *University of Texas*

5   *Southwestern Medical Center v. Nassar*, the causal link between the protected activity and

6   the employer's action in a retaliation claim under Title VII must be "proved according to

7   traditional principles of but-for causation, not the lessened causation test stated in §

8   2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the

9   absence of the alleged wrongful action or actions of the employer." 133 S.Ct. 2517, 2533

10  (2013). Accordingly, Plaintiff must show that she would not have been terminated but-for

11  her complaints about Wang's alleged sexual discrimination.

12       Here, Plaintiff provides no direct evidence[18] of but-for causation, and instead asks the

13  Court to infer causation from the chain of events. On February 1 and 17, respectively,

14  Plaintiff informally and then formally complained of Wang's conduct, alleged sex

15  discrimination, and demanded that Wang never interact with her without a witness. Next,

16  Maculuso investigated Plaintiff's complaint, found it without merit, determined Wang was

17  not a threat to Plaintiff or others, and uncovered numerous deficiencies in Plaintiff's job

18  performance (largely the deficiencies that precipitated Wang's criticisms in Incidents Four,

19  Five, and Six). On February 25, Plaintiff received a written disciplinary warning and

20  counseling, and was given the opportunity to create an action plan to improve her job

21  performance. Instead, Plaintiff again refused to work with Wang. Finally, on February 28,

22  Plaintiff was terminated. (DSOF ¶¶ 41–47, 49–50; PSOF ¶¶ 41–47, 49–50, 67–69 (admitting

23  DSOF ¶¶ 41–47, 49–50)).

24  ───────────────

25  raised for the first time in opposition to summary judgment is not properly before the district

26  court).

27      [18] During her deposition, Plaintiff could only articulate one fact evidencing retaliation:
    the proximity in time between her February 17 formal complaint to HR and the February 28

28  termination of her employment. (Drottz Dep., Doc. 50, Ex. 2 at 265:24–266:8).

Plaintiff argues (Doc. 51 at 10–11) that the causal link between Plaintiff's complaints and her termination is "clear" because the disciplinary report mentions the findings of the investigation of Plaintiff's complaints (showing Defendant's knowledge of the protected activity) and the proximity in time between the two events (less than one month from the first informal complaint to termination).

Under the pre-*Nassar* "motivating factor" test, evidence of knowledge and proximity in time, together, could have been sufficient for the Court to find a disputed issue of fact on causation. *Yartzoff*, 809 F.2d at 1376 (citing *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731–32 (9th Cir. 1986)); *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000) (a causal link may be inferred from proximity in time). Post-*Nassar*, however, Plaintiff must meet the "more demanding" burden of showing but-for causation. *Nassar*, 133 S.Ct. at 2534. While knowledge and proximity in time certainly remain relevant when inferring but-for causation, in this case they cannot be enough to satisfy Plaintiff's prima facie burden. If the Court were to hold otherwise, it would transmute an employee's preemptive engagement in a protected activity, whether frivolous or not, into a shield against the imminent consequences of poor job performance. Such an interpretation of Section 2000e-3(a) is now inconsistent with the Supreme Court's guidance in *Nassar*. *See id.* at 2531–32 (discussing the "ever-increasing frequency" of retaliation claims and how a weak causation standard emboldens frivolous claims that sap judicial resources and "raise the costs, both financial and reputational, on an employer whose actions were not in fact the result of any discriminatory or retaliatory intent"); *see also*, *Brooks*, 229 F.3d at 917 (recognizing a concern that "employers will be paralyzed into inaction once an employee has lodged a complaint under Title VII, making such a complaint tantamount to a 'get out of jail free' card for employees engaged in job misconduct").

Here, Plaintiff has only adduced evidence of knowledge and proximity in time. Plaintiff has offered no other evidence supporting but-for causation despite admitting that her

1    job performance had been deficient and refusing to work with her direct supervisor, Wang.[19]

2    Thus, Plaintiff has not set forth sufficient evidence on which to establish a genuine issue of

3    material fact on but-for causation, an element of a prima facie Title VII retaliation claim.

4                    **3.    Defendant's Non-Retaliatory Reasons and Pretext**

5            Plaintiff's failure to show a prima facie case renders moot the remainder of the burden

6    shifting analysis.  Nonetheless, the Court notes that the substantial evidence (including

7    Plaintiff's own admissions) of Plaintiff's poor job performance and obstinate refusal to work

8    with Wang, her direct supervisor, constitute a legitimate, non-retaliatory reason for

9    Defendant's action.  (DSOF ¶¶ 46–47, 49; PSOF ¶¶ 46–47, 49 (admitting DSOF ¶¶ 46–47,

10   49)).  Furthermore, Plaintiff has offered no evidence relevant[20] to establishing pretext aside

11   from the plainly insufficient showing that Defendant's had knowledge of Plaintiff's

12   complaints and the proximity in time of the two events.  (*See* Doc. 51 at 11–13).  Therefore,

13   even if Plaintiff had met her prima facie burden, Plaintiff would still have failed to

14   demonstrate a genuine dispute of material fact.  Accordingly, the Court grants summary

15   judgment to Defendant on Plaintiff's claim of retaliation for complaints of sex and race

16   _____

17       [19] During oral argument, Plaintiff attempted to demonstrate "but-for causation" by

18   recharacterizing her refusal to work with Wang as a protected activity.  Specifically, Plaintiff
     claims her refusal to work with Wang was a continuation of her objection to discriminatory

19   treatment by Wang.  The Court finds that an employee's personal declaration that she will
     not work with her direct supervisor is not a protected activity.  Thus, Plaintiff's refusal to

20   work with Wang was not a protected activity and cannot form the basis of her retaliation
     claim.  To hold otherwise would permit an employee to have an undisclosed objection to her

21   supervisor that grants her complete liberty to quit doing her job.  Title VII, however, requires
     a protected activity that is something other than job abandonment as a form of protest.

22

23       [20] Plaintiff argues that pretext is plainly evident from the lack of concurrent discipline
     of Wang by Maculuso.  (Doc. 51 at 12).  Plaintiff has not, however, explained how this fact

24   actually constitutes relevant evidence of pretext in light of the context of the situation.  First,
     Maculuso is a person of the same race and sex as plaintiff.  Second, Wang responded to the

25   investigation's results by "committ[ing] to tak[e] steps to improve his working relationship
     with Plaintiff."  (DSOF ¶ 47; PSOF ¶ 47 (admitting DSOF ¶ 47)).  Third, in contrast to

26   Wang's commitment, "Plaintiff refused to work with Wang (her direct supervisor) and
     insisted that a witness be present whenever Wang needed to speak with her."  (DSOF ¶ 46;

27   PSOF ¶ 46 (admitting DSOF ¶ 46)).

28

1  discrimination.

2  **D.    Race Discrimination and Retaliation Under 42 U.S.C. § 1981**

3  Plaintiff's fourth cause of action alleges that Defendant retaliated against her for

4  reporting race discrimination, in violation of 42 U.S.C. § 1981. (Doc. 26 ¶¶ 51–55).  The

5  Court notes that in her Response, Plaintiff does not offer an argument supporting her § 1981

6  racial discrimination and retaliation claim; Plaintiff appears to have abandoned the claim.

7  (Doc. 51).  Defendant, in its Motion, accurately explains that in her deposition, Plaintiff

8  complained of racial animus only in Incident One (Wang and Hao's conversation in Chinese,

9  discussed above).  (Doc. 49 at 8).  As explained above, Incident One evidenced no racial

10  animus and, as such, cannot support a race discrimination and retaliation claim. *Scott v. City*

11  *of Phoenix*, No. CV-09-0875-PHX-JAT, 2011 WL 3159166, at *3 n.3 (D. Ariz. July 26,

12  2011) ("Claims of disparate treatment arising under Title VII and Section 1981 are parallel

13  because both require proof of intentional discrimination. The same standards are used to

14  prove both claims, and facts sufficient to give rise to one are sufficient to give rise to the

15  other.") (quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1010 (9th Cir. 1985) (internal

16  citations omitted)).  Accordingly, the Court grants summary judgment to Defendant on

17  Plaintiff's claim of race discrimination and retaliation under 42 U.S.C. § 1981.

18  **E.    Wrongful Discharge In Violation of A.R.S. § 23-1501(3)(c)(ii)**

19  Plaintiff's fifth cause of action alleges that Defendant violated the whistleblowing

20  provision of Arizona's Employment Protection Act ("AEPA") by terminating Plaintiff's

21  employment[21] in retaliation for Plaintiff's February 17 formal complaint about Wang. (Doc.

22  _____

23  [21] In Plaintiff's Response, Plaintiff for the first time argues that the February 25
disciplinary warning was also a retaliatory action.  (Doc. 51 at 10).  Plaintiff's Third
24  Amended Complaint only alleged termination (Doc. 26 ¶¶ 57–58) and, at deposition,
Plaintiff's counsel agreed to "stipulate that the only retaliatory act that [Plaintiff] is claiming
25  is termination" (Drottz Dep., Doc. 50, Ex. 2 at 265:16–22).  Consequently, the Court will not
consider whether the February 25 disciplinary warning was a retaliatory action. *See Trishan*
26  *Air, Inc. v. Federal Ins. Co.*, 635 F.3d 422, 435 n.19 (9th Cir. 2011) (holding that a claim
raised for the first time in opposition to summary judgment is not properly before the district
27  court).

28

26 ¶ 57–58; Doc. 51 at 9).  Specifically, Plaintiff alleges that she reported two criminal actions by Wang: (1) Assault, under A.R.S. § 13-1203; and (2) Harassment, under A.R.S. § 13-2921.  (Doc. 26 ¶ 57).

### 1.    Legal Framework

An employee has a claim against an employer under A.R.S. § 23-1501(3)(c)(ii) if the employer has terminated the employment relationship in retaliation for:

> [t]he disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this state or an employee of a public body or political subdivision of this state or any agency of a public body or political subdivision.

A.R.S. § 23-1501(3)(c)(ii).  By the plain terms of the AEPA, a plaintiff must point to a predicate Arizona constitutional provision or statute that the employer "is violating or will violate." *Id.*  In order to fulfill that requirement, Plaintiff alleges that she was terminated in retaliation for reporting conduct that constitutes criminal assault under A.R.S. § 13-1203 and harassment under A.R.S. § 13-2921.  (Doc. 26 ¶ 57).

### 2.    Predicate Violation of an Arizona Statute

Defendants argue (Doc. 49 at 12–16) that Plaintiff fails to state a prima facie case under A.R.S. § 23-1501(3)(c)(ii) because Plaintiff did not have a reasonable belief that Wang committed a violation of either predicate statute Plaintiff cites.  An actual violation of the predicate statute need not occur.  *Logan v. Forever Living Prod. Int'l, Inc.*, 52 P.3d 760, 763 (Ariz. 2002) (citing *Wagonseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1035 (Ariz. 1985)); *see Murcott v. Best Western Int'l, Inc.*, 198 Ariz. 349, 357 (Ariz. App. 2000).  Rather, the AEPA allows wrongful termination claims when an employee has a *reasonable* belief that the employer "has violated, is violating, or will violate the Constitution of Arizona or the statutes of this state."  A.R.S. § 23-1501(3)(c)(ii).  The Court will consider the reasonableness of Plaintiff's belief that Wang violated each statute, in turn.

### a.    Assault Under A.R.S. § 13-1203

Plaintiff's report of assault is predicated on Incident Seven, Wang's February 17 entrance into Plaintiff's office. (Doc. 51 at 9).  Criminal assault in Arizona is defined as: (1) "[i]ntentionally, knowingly or recklessly causing any physical injury to another person;" (2) "[i]ntentionally placing another person in reasonable apprehension of imminent physical injury;" or (3) "[k]nowingly touching another person with the intent to injure, insult or provoke such person." A.R.S. § 13-1203(A). Plaintiff has admitted that Wang did not injure or touch Plaintiff in any way.   (DSOF ¶ 33; PSOF ¶ 33 (admitting DSOF ¶ 33)). Consequently, Plaintiff must exclusively rely on demonstrating that Wang "intentionally plac[ed Plaintiff in] reasonable apprehension of physical injury." A.R.S. § 13-1203(A); *see* Doc. 51 at 9.  Plaintiff's reliance is misplaced for two reasons.

First, Plaintiff has neither alleged nor produced evidence that Wang intended to put Plaintiff in fear.  Without a belief that Wang intended to scare her (whether reasonable or not), Plaintiff could not have reasonably believed that, absent any physical contact, Wang had criminally assaulted Plaintiff.   Second, Wang's conduct did not put Plaintiff in a reasonable apprehension of fear.  Plaintiff presents no evidence of her reasonable fear besides her own statements that "[b]ecause [Wang] forced his way into my office, I feel that he may become physically violent with me." (Doc. 51 at 9 (quoting Drottz Report to HR, Doc. 50-1, Ex. 11 at 2); PSOF ¶ 62).  Plaintiff's uncorroborated statements on this point carry little weight because the Ninth Circuit "has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." *Villiarimo*, 281 F.3d at 1061 (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)).  Even if the incident occurred exactly as Plaintiff describes (PSOF ¶¶ 25–35, 61–62; DSOF ¶¶ 25–35), "Wang's angry demeanor, pushing the door open and demanding to know who Plaintiff was talking to" was insufficient to place Plaintiff in reasonable apprehension of imminent physical injury.  This is because Plaintiff has admitted that, despite their previous heated interactions, Wang had never touched or threatened to touch Plaintiff. (DSOF ¶ 33; PSOF ¶ 33 (admitting DSOF ¶ 33)).  During this incident, Wang did not approach Plaintiff with a

clenched fist, tell Plaintiff he was going to hit her, or lunge towards her.  (DSOF ¶ 35; PSOF ¶ 35 (admitting DSOF ¶ 35)).  Moreover, Plaintiff did not feel the need to leave her office and even continued her conversation with Macaluso.  (*Id.*).  Lastly, despite her claims that she feared Wang, Plaintiff has admitted that she took no steps to protect herself from potential harm.  (Drottz Dep., Doc. 50, Ex. 2 at 227:16–18).  In light of all of the evidence, Plaintiff could not have reasonably believed that Wang had placed her in reasonable apprehension of an imminent physical injury.

In sum, Plaintiff has not shown a genuine issue of material fact that she reasonably believed Wang had criminally assaulted her under A.R.S. § 13-1203.  Therefore, Plaintiff's report of the alleged assault cannot be the predicate violation necessary to sustain an AEPA claim.

### b.   Harassment Under A.R.S. § 13-2921

Plaintiff's report of harassment is predicated on Incident Seven, Wang's February 17 entrance into Plaintiff's office.  (Doc. 51 at 9).  Criminal harassment in Arizona is defined as "conduct that is directed at a specific person and that would cause a reasonable person to be seriously alarmed, annoyed or harassed and the conduct in fact seriously alarms, annoys or harasses the person."  A.R.S. § 13-291(E).  Further, criminal harassment against a non-public officer or employee can only occur if committed "with intent to harass or with knowledge that the person is harassing another person," and in one of six circumstances:

1.  Anonymously or otherwise contacts, communicates or causes a communication with another person by verbal, electronic, mechanical, telegraphic, telephonic or written means in a manner that harasses.

2. Continues to follow another person in or about a public place for no legitimate purpose after being asked to desist.

3. Repeatedly commits an act or acts that harass another person.

4. Surveils or causes another person to surveil a person for no legitimate purpose.

5. On more than one occasion makes a false report to a law enforcement, credit or social service agency.

6. Interferes with the delivery of any public or regulated utility to a person.

1  A.R.S. § 13-2921(A).

2      In the instant case, "Plaintiff's criminal harassment claim is solely predicated on"

3  Incident Seven.   (DSOF ¶ 36; PSOF ¶ 36 (admitting DSOF ¶ 36)).   Consequently,

4  circumstances two, four, five, and six are plainly inapplicable.   Circumstance one is also

5  plainly inapplicable because Plaintiff has not alleged any harassing communications during

6  the incident.   In her Response, Plaintiff cites only to the third circumstance, "*repeatedly*

7  commits an act or acts that harass another person," A.R.S. § 13-291(A)(3) (emphasis added),

8  but does not articulate how this single incident can possibly constitute repeated behavior.

9  (Doc. 51 at 9–10).   Thus, circumstance six is also plainly inapplicable.   Because each of the

10 six circumstances is plainly inapplicable, Plaintiff could not have reasonably believed that

11 Wang had criminally harassed her.   Therefore, Plaintiff has not shown a genuine issue of

12 material fact that she reasonably believed Wang had criminally harassed her under A.R.S.

13 § 13-2921 and Plaintiff's report of the alleged criminal harassment cannot be the predicate

14 violation necessary to sustain an AEPA claim.

15     In sum, Plaintiff has failed to show a genuine issue of material fact that Plaintiff

16 reasonably believed she was reporting a predicate violation of an Arizona statute.   Plaintiff,

17 therefore, is not eligible for the Section 23-1501(3)(c)(ii) whistleblowing protections of the

18 AEPA.   Because Plaintiff failed to establish a prima facie case, the Court need not analyze

19 Defendant's remaining arguments (Doc. 49 at 16–17; Doc. 59 at 8–10) that Plaintiff has

20 failed to meet her causation burden and that Defendant had a legitimate, non-retaliatory

21 reason for terminating Plaintiff's employment.   Accordingly, the Court grants summary

22 judgment to Defendant on Plaintiff's claim of wrongful discharge (retaliation) in violation

23 of A.R.S. § 23-1501(3)(c)(ii).

24

25 **IV.    CONCLUSION**

26     After reviewing the evidence submitted by both parties, and viewing the evidence

27 favorably to Plaintiff, the Court finds that Plaintiff has failed to submit sufficient evidence

28 to show a genuine issue of material fact on each of Plaintiff's five counts.   Accordingly and

based on the foregoing,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 49) is granted.  Because this resolves each of Plaintiff's claims in this case, the Clerk of the Court shall enter judgment for Defendants, and against Plaintiff, Plaintiff shall take nothing.

DATED this 25th day of November, 2013.

James A. Teilborg
Senior United States District Judge